IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CARMITCHELL HARRIS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 06-1030-CV-W-ODS ) |
| MICHAEL J. ASTRUE,[1] Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and Supplemental Security Income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in 1963 and has graduated from high school. He has prior work experience as a machine tender, material handler, nurse's aide and painter. He filed applications for benefits under Title II and Title XVI of the Social Security Act on May 30, 2003, alleging he became disabled on December 5, 2001, due to double bypass heart surgery. The applications were initially denied. In a decision on November 25, 2005, following a hearing, an Administrative Law Judge ("ALJ") found Plaintiff was not under a "disability" as defined in the Social Security Act. On November 9, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. The decision of the ALJ stands as the final decision of the Commissioner.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and should, therefore, be substituted as the Defendant in this case. Fed. R. Civ. P. 25(d)(1).

*A. Medical Records*

On December 1, 2001, Plaintiff reported to the emergency room complaining of chest pains from physical exertion. Plaintiff was told to take it easy until a stress echocardiogram could be administered. On December 5, 2001, Plaintiff reported to Robert M. Glueck, M.D., F.A.C.C., for a stress test. The echocardiogram was markedly abnormal. Dr. Glueck diagnosed Plaintiff with coronary artery disease and scheduled a coronary bypass surgery for the next day (Tr. 222-23, 227-32).

On December 6, 2001, Plaintiff underwent coronary bypass surgery. Plaintiff had normal left ventricular function; however, the left main coronary artery was diffusely diseased with high grade stenosis. The left ventricular diameter was reduced by up to 50%. The right coronary artery had no more than a 40% reduction in lumen diameter. Plaintiff's surgery was successful and on December 10, 2001, he was discharged on an enteric coated aspirin daily, Metoprolol, Diltiazem, and Vicodin (Tr. 228-236).

On April 25, 2002, Plaintiff presented to his family physician, Gerald F. Williams, D.O. Dr. Williams conducted a stress test. His impressions were heart disease with three vessel coronary bypass graft, high cholesterol, and a history of cigarette use. Plaintiff was prescribed Lipitor for his high cholesterol and was advised to return in two months for lab tests (Tr. 313-15).

On June 26, 2002, Plaintiff presented to William S. Ritter, M.D., F.A.C.C., after a referral by Dr. Glueck, for his six-month post-operative cardiac examination. Dr. Ritter indicated that Plaintiff had done well since his surgery. He noted that Plaintiff had stopped smoking and had been exercising on a regular basis. Plaintiff had no complaints of chest pain or shortness of breath. Dr. Ritter stated that Plaintiff's post-operative status was stable and recommended he return in another six months for a stress echocardiogram (Tr. 301-02).

On September 27, 2002, Plaintiff reported to Dr. Williams complaining of shortness of breath. Dr. Williams detected an aortic murmur not previously found (Tr. 312-13). On October 15, 2002, Plaintiff underwent a stress echocardiogram. The test indicated that the diameter of Plaintiff's left artery was at the upper limits of normal and that his aortic root was moderately dilated with moderate aortic regurgitation (Tr. 330).

On October 31, 2002, Plaintiff visited Dr. Williams for further follow-up. Dr. Williams again noted the aortic murmur. Plaintiff denied experiencing chest pain or shortness of breath with daily activities (Tr. 310).

On November 7, 2002, Plaintiff reported to Dr. Ritter for his six-month follow-up visit and for evaluation of the recently discovered murmur. Plaintiff reported mild shortness of breath and fatigue, but no chest pains or dizziness. Examination revealed normal heart sounds and a diastolic murmur along the left sternal border. Plaintiff underwent a stress test in which he exercised for seven minutes with no exercise induced complications. Dr. Ritter's impression was moderate aortic insufficiency with mild dilatation of the aortic root. Dr. Ritter scheduled another echocardiogram in one month, advised Plaintiff to notify the office if he experienced shortness of breath or chest pains, and advised Plaintiff that valve replacement may be required if his symptoms continued to worsen (Tr. 277-78).

Plaintiff returned to Dr. Ritter two more times in the following months and had two echocardiograms. These tests showed aortic insufficiency and aortic regurgitation (Tr. 272-76, 320). Then, after nearly two years without a medical record, on April 11, 2005, Plaintiff presented to Dr. Ritter complaining of shortness of breath with even light activity. Cardiac examination revealed a murmur along the sternal border with aortic insufficiency. An echocardiogram indicated moderately severe aortic insufficiency with the aortic root increasing in diameter. Dr. Ritter stated that Plaintiff's shortness of breath may be related to the aortic insufficiency, rather than other causes such as deconditioning and obesity. He ordered testing to further assess the potential need for aortic valve replacement surgery (Tr. 355-58).

On April 14, 2005, Plaintiff underwent a transesophageal echocardiogram. The results indicated the diameter of Plaintiff's left ventricle was in the upper limits of the normal range. The results also showed left ventricle regurgitation that was compatible with moderately severe aortic insufficiency. Dr. Ritter noted that Plaintiff had recently been experiencing shortness of breath with only very mild exertion. Plaintiff had no chest pain or other symptoms suggesting angina. Dr. Ritter again noted that aortic valve surgery may be required (Tr. 361-63).

3

On April 18, 2005, Dr. Williams completed a residual functional capacity ("RFC") evaluation of Plaintiff. His diagnoses included severe aortic insufficiency and ischemia, with a guarded prognosis, and symptoms of fatigue and tiredness. Dr. Williams stated that Plaintiff had a marked limitation in his ability to deal with work stress and that his symptoms were frequently severe enough to interfere with attention and concentration. He noted that Plaintiff would require unscheduled breaks in fifteen minute intervals every hour during the working day. Additionally, Dr. Williams indicated that Plaintiff's impairments could cause absence from work approximately twice a month. He noted that September 2002 was the earliest date to which his limitations applied (Tr. 380-85).

On April 19, 2005, Dr. Ritter performed a cardiac catherization. Plaintiff had aortic insufficiency with an enlarged left ventricle. Plaintiff's left artery was diseased. Dr. Ritter recommended a valve replacement and a second coronary bypass surgery (Tr. 386). On May 10, 2005, Plaintiff underwent surgery to repair his bypass graft and replace his aortic valve. Dr. Williams noted that a recent sleep study suggested Plaintiff had mild sleep apnea. Plaintiff received a continuous positive airway pressure unit ("CPAP") to assist with breathing while in the hospital. Plaintiff was discharged from the hospital on May 16, 2005 (Tr. 459-63, 471, 487).

On June 21, 2005, Plaintiff reported to F. Douglas Biggs, M.D., F.A.C.C., for a post-operative examination. Plaintiff reported some shortness of breath with exertion, but stated that it was getting progressively better. Plaintiff stated that he was generally feeling better than he did before the surgery. Examination showed normal heart rhythm with no murmurs. Dr. Biggs instructed Plaintiff to return for a follow-up examination after another echocardiogram in six months (Tr. 484-85).

*B. Hearing Testimony*

On August 29, 2005, Plaintiff testified at an administrative hearing before the ALJ. Plaintiff testified that he had his first coronary bypass surgery on December 6, 2001, and that he received follow-up care every six months. He stated that he complained continually to Dr. Ritter of fatigue and shortness of breath following his first surgery, which Dr. Ritter did not address until April 2005 when he ordered additional tests. Plaintiff testified that he had a valve replacement and second bypass surgery in

4

May 2005. He testified that his sleep apnea and breathing device interfered with his sleep. He stated that he spent his days taking naps (at least three per day for 15 to 60 minutes each) and transporting his children after school. He also cooked and did laundry with his children's help. He stated that he was unable to work because of shortness of breath and fatigue caused by his cardiovascular condition (Tr. 44-45, 64-68, 70).

Richard Watts, M.D., testified at the hearing as a medical expert ("ME"). After reviewing Plaintiff's medical history, the ME testified that Plaintiff's impairments did not meet or equal any of the Commissioner's listings. He stated that Plaintiff's second surgery relieved his cardiac symptoms. He noted that there were no medical records from April 2003 through May 2005, which indicated that Plaintiff was doing well. He concluded that Plaintiff retained the residual functional capacity for light work before early 2005, and for sedentary work after that (Tr. 50-54).

Janice Hastert, a vocational expert ("VE") also testified at the hearing. The ALJ posed a hypothetical question in which he assumed Plaintiff could lift and carry ten pounds maximum and two to three pounds frequently. The VE stated that these restrictions would preclude any of Plaintiff's past work. However, she stated that such a person could perform sedentary work, which included jobs such as an electronics assembler, a phone solicitor, an optical goods assembler, or a security monitor, all of which existed in significant numbers in the local and national economies. The VE further testified that there would be no jobs available if an individual required work breaks for an hour more than once a day, or if an individual would miss two to four days of work per month because of medical problems (Tr. 70-73).

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714

(8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The ALJ found that Plaintiff had severe impairments based on his two bypass surgeries, his aortic valve replacement surgery, and his sleep apnea. The ALJ further found that the severity of these impairments, either singularly or in combination, did not meet the criteria described in the Listing of Impairments in 20 C.F.R. Part 404, Appendix 1, Subpart P. He next found that Plaintiff's RFC did not allow him to perform the requirements of his past relevant work, but that it did allow him to perform a significant range of sedentary work in jobs available in substantial numbers in the local and national economies.

*A. Plaintiff's Credibility*

After listening to the testimony of Plaintiff and the ME and reviewing the medical records, the ALJ found that Plaintiff's allegations regarding his cardiac condition were not fully credible. Plaintiff argues that such a finding is not supported by substantial evidence on the record as a whole. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that he experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence

6

> does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The ALJ found that Plaintiff's subjective complaints of disability were inconsistent with the objective medical evidence. The records showed Plaintiff's condition improved after his first surgery–he began exercising and he performed well on a stress test. Additionally, Plaintiff's complaints to his doctors were minimal. He did express some complaints of shortness of breath to Dr. Williams and Dr. Ritter, but he never had complaints of chest pain, dizziness, or other cardiac symptoms from December 2001, to May 2003. The ALJ also noted Plaintiff's testimony that his sleep apnea caused him fatigue during the day, was not supported by the medical records, as it was not even diagnosed until May 2005, and the record did not contain evidence of treatment for the condition or limitations caused by it.

Additionally, the ALJ noted that despite testimony to the contrary,[2] there was no

---

[2] In April 2005, Dr. Ritter refers to an echocardiogram performed on March 25, 2004; however, there is no record of this, nor is there any additional reference by any

7

objective evidence in the record of treatment from May 2003 to April 2005.  While an ALJ has a duty to supplement the record, Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996), reversal due to failure to develop the record is only justified where such failure is unfair or prejudicial.  Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).  It is Plaintiff's burden to show that his allegations are supported by objective medical evidence.  Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).  Plaintiff has not suggested the ALJ failed to solicit medical records from doctors who treated Plaintiff or that identified doctors failed to provide all of their records.   Additionally, the Eighth Circuit has stated that whether plaintiff's counsel has attempted to obtain the missing records is relevant to the prejudice inquiry.  Lacroix v. Barnhart, 465 F.3d 881, 886 n.2 (8th Cir. 2006).  Here, there is no evidence that Plaintiff or his attorney attempted to obtain the alleged missing medical records.  Further, the ALJ only used the lack of medical records during the two-year period as one factor weighing against Plaintiff's credibility.

The ALJ also considered the inconsistency between Plaintiff's complaints and his statements to Dr. Biggs following his second surgery, as well as his testimony regarding his activities of daily living.  While Plaintiff testified that he was constantly fatigued and short of breath, requiring several naps each day, he reported to Dr. Biggs that his symptoms were improving after his second operation.  Additionally, Plaintiff testified that he did laundry, cooked, shopped for groceries, and transported his children to and from school.  The ALJ could properly discount Plaintiff's subjective reports of impairment because they were not consistent with his daily activities or medical records.

In further support of his credibility finding, the ALJ noted Plaintiff's sporadic work history with below average earnings.  "A lack of work history may indicate a lack of motivation to work rather than a lack of ability."  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)).  The ALJ's credibility finding is supported by substantial evidence on the record as a whole.

*B. Dr. Williams's Opinion*

The Plaintiff argues that the ALJ incorrectly discredited the RFC evaluation by Dr.

---

physician to treatment in 2004.

Williams in formulating Plaintiff's RFC. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). In addition, a specialist's opinion is entitled to greater weight. E.g., Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003).

The ALJ found Dr. Williams's opinion to be inconsistent with other physicians' assessments, the findings in the objective medical evidence, the opinion of the ME, and Plaintiff's own statement to Dr. Biggs. The ALJ further noted that Dr. Williams's RFC assessment was conclusory and failed to rely on any specific objective findings in support of his conclusions. Additionally, his assessment was made before Plaintiff's second bypass surgery. The ALJ could properly discount Dr. Williams's opinion in formulating Plaintiff's RFC, finding it to be inconsistent with the evidence as a whole. See Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004).

*C. Hypothetical to the VE*

Plaintiff contends the ALJ's hypothetical to the VE did not adequately address Plaintiff's limitations because it did not include the limitations found by Dr. Williams. Because the Court has concluded the ALJ properly discounted Dr. Williams's opinion, it also finds that the ALJ properly left this opinion out of his hypothetical to the VE.

### III. CONCLUSION

The Court concludes there is substantial evidence in the record as a whole to support the Commissioner's decision, and his final decision denying benefits is affirmed.

IT IS SO ORDERED.

DATE: October 22, 2007

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT